UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM JARVIS,

      Petitioner,

v.                              Case No. 3:19-cv-1097-MMH-PDB

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## **ORDER**

### **I. Status**

Petitioner William Jarvis, an inmate of the Florida penal system, initiated this action on September 24, 2019, by filing a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Petition; Doc. 1).[1] In the Petition, Jarvis challenges a 2003 state court (Duval County, Florida) judgment of conviction for first-degree murder, first-degree arson, and placing a bomb causing bodily harm. He raises seven grounds for relief. See Petition at 18-61. Respondents submitted a memorandum in opposition to the Petition. See

---

[1] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

Response (Doc. 9). They also submitted exhibits. <u>See</u> Docs. 9-1 through 42-9. Jarvis filed a brief in reply. <u>See</u> Reply (Doc. 47). This action is ripe for review.

## II. Relevant Procedural History

On April 5, 2001, the State of Florida charged Jarvis by indictment with first-degree murder (count one), first-degree arson (count two) and two counts of throwing bombs causing damage (counts three and four). Doc. 9-1 at 57-59. On May 1, 2001, the State filed a notice of intent to seek the death penalty for count one. <u>Id.</u> at 73. Almost a year later, on April 10, 2002, the State charged Jarvis by amended indictment with first-degree murder (count one), first-degree arson (count two), and two counts of placing a bomb causing bodily harm (counts three and four). Doc. 11-1 at 162-164.

Jarvis proceeded to trial, and on October 10, 2003, at the conclusion of a guilt phase trial, the jury found Jarvis guilty of all counts. Doc. 11-3 at 23-27. On October 23, 2003, after a penalty phase trial, the jury recommended that the trial court sentence Jarvis to a term of life imprisonment for count one. <u>Id.</u> at 172. Consistent with the jury's recommendation, on November 14, 2003, the trial court sentenced Jarvis to concurrent terms of life imprisonment for counts one and two, and also sentenced him to consecutive terms of life imprisonment for counts three and four. Doc. 11-4 at 94-101. The trial court ordered the

sentence imposed for count three run consecutively to the sentence imposed for count one. Id. at 98.

On direct appeal, Jarvis, with the benefit of counsel, filed an initial brief and a corrected initial brief, arguing that the trial court erred by: denying his motion for mistrial when the State improperly shifted the burden of proof to the defense (ground one); admitting evidence in violation of Crawford v. Washington[2] (ground two); denying the motion for a new trial in which he argued the State presented insufficient circumstantial evidence to rebut his reasonable hypotheses of innocence (ground three); denying his motion to suppress the results of search warrants (ground four); and denying his objection to the admission of irrelevant and prejudicial evidence from CD-ROMs (ground five). Docs. 29 at 2-88; 32-1 at 2-88.  The State filed an answer brief and an amended answer brief. Docs. 30 at 2-73; 31 at 2-37; 33-6 at 5. Jarvis filed a reply brief. Doc. 33-6 at 6. The First District Court of Appeal (First DCA) per curiam affirmed Jarvis's convictions and sentences without a written opinion on December 22, 2005, Doc. 32-2 at 2, and the court issued the mandate on March 16, 2006, Doc. 32-5 at 2. On October 2, 2006, the United

---

[2] 541 U.S. 36 (2004).

States Supreme Court denied Jarvis's petition for writ of certiorari. Jarvis v. Florida, 549 U.S. 849 (2006).

Jarvis filed a pro se motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 on November 16, 2007. Doc. 35-2 at 2-48. Jarvis also filed an amended motion for postconviction relief on September 12, 2008. Doc. 35-3 at 2-53. In his Rule 3.850 Motions,[3] Jarvis alleged counsel was ineffective for failing to: file sufficient motions for judgment of acquittal (ground two);[4] object to improper opening statements (ground ten); object to improper closing arguments (ground eleven); and investigate and present evidence in support of Jarvis's alibi defense (ground twelve). Docs. 35-2 at 5, 15-24; 35-3 at 6, 16-25. Jarvis also alleged entitlement to relief based on changes in the law as set forth in Holmes v. South Carolina[5] (ground twenty-seven) and Crawford v. Washington (ground twenty-eight). Docs. 35-2 at 42-45; 35-3 at 43-46. The circuit court held an evidentiary hearing on many of the claims raised by Jarvis, including subclaim thirteen of ground eleven, of his Rule 3.850 Motions. Doc. 39-1 at 2. On July 12, 2012, the circuit court denied

---

[3] The Court collectively refers to Jarvis's initial Rule 3.850 Motion and amended Rule 3.850 Motion as his Rule 3.850 Motions.

[4] Jarvis raised thirty claims in his Rule 3.850 Motions. In this Order, the Court discusses only the claims relevant to the instant Petition.

[5] 547 U.S. 319 (2006).

relief on all grounds. Doc. 39-1 at 2-99. The First DCA per curiam affirmed the denial of relief without a written opinion on February 26, 2014, Doc. 41-5 at 2, and on April 23, 2014, issued the mandate, Doc. 41-10 at 3.

On March 18, 2014, Jarvis filed a pro se motion to correct illegal sentence pursuant to Florida Rule of Criminal Procedure 3.800(a), and the circuit court denied relief on August 31, 2017. Docs. 42-2 at 2-17; 42-3 at 2. The First DCA affirmed the denial of relief in a written opinion on June 7, 2019. Doc. 42-6 at 2-3. On June 24, 2019, Jarvis filed a motion for rehearing. Doc. 42-7 at 2-5. On February 6, 2020, the First DCA granted Jarvis's motion for rehearing, determined that his consecutive mandatory minimum sentences for a single criminal act of placing a bomb were illegal, and reversed and remanded for resentencing as to counts three and four. Doc. 42-8 at 2-3. The First DCA issued the mandate on February 27, 2020. Doc. 42-9 at 2. On May 21, 2020, the circuit court resentenced Jarvis to concurrent mandatory minimum terms of life imprisonment for counts three and four. See State of Florida v. Jarvis, No. 01-2576-CF (Fla. 4th Cir. Ct.).

### III. One-Year Limitations Period

This action was timely filed within the one-year limitations period. See 28 U.S.C. § 2244(d).

5

## IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318-19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Jarvis's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v.

<u>Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011) (quotation marks omitted)). As such, federal habeas review of final state court decisions is "'greatly circumscribed' and 'highly deferential.'" <u>Id.</u> (quoting <u>Hill v. Humphrey</u>, 662 F.3d 1335, 1343 (11th Cir. 2011) (quotation marks omitted)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See <u>Marshall v. Sec'y, Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See <u>Harrington v. Richter</u>, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 1192, 1196.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97-98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523

8

(plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013); accord Brumfield v. Cain, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"[6] Titlow, 571 U.S. at ---, 134 S. Ct. at 15 (quoting Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016); see Teasley v. Warden, Macon State Prison, 978 F.3d 1349, 1356 n.1 (11th Cir. 2020). Also,

---

[6] The Eleventh Circuit has described the interaction between § 2254(d)(2) and § 2254(e)(1) as "somewhat murky." Clark v. Att'y Gen., Fla., 821 F.3d 1270, 1286 n.3 (11th Cir. 2016).

deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. See Cullen v. Pinholster, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" Tharpe, 834 F.3d at 1338 (quoting Richter, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. Richter, 562 U.S. at 102. A district court's obligation is "to train its attention" on the legal and factual basis for the state court's ruling, not to "flyspeck the state court order or grade it." Meders v. Warden, Ga. Diagnostic Prison, 911 F.3d 1335, 1349 (11th Cir. 2019) (citing Wilson, 138 S. Ct. at 1191-92). Thus, to the extent that a petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

## B. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S. Ct. 2052.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a

11

> trial whose result is reliable." <u>Id.</u>, at 687, 104 S. Ct. 2052.

<u>Richter</u>, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward</u>, 592 F.3d at 1163. Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Id.</u> (citing <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in <u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." <u>Strickland</u>, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." <u>Richter</u>, 562 U.S. at ---, 131 S. Ct. at 788. But "[e]stablishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." <u>Id.</u> (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that

12

> determination was unreasonable — a substantially
> higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S.
> 111, 123, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009)
> (quotation marks omitted). If there is "any reasonable
> argument that counsel satisfied <u>Strickland</u>'s
> deferential standard," then a federal court may not
> disturb a state-court decision denying the claim.
> <u>Richter</u>, 562 U.S. at ---, 131 S. Ct. at 788.

<u>Hittson v. GDCP Warden</u>, 759 F.3d 1210, 1248 (11th Cir. 2014); <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the deference to counsel's performance mandated by <u>Strickland</u>, the AEDPA adds another layer of deference — this one to a state court's decision — when we are considering whether to grant federal habeas relief from a state court's decision." <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

As ground one, Jarvis asserts that the trial court erred when it denied his motion for a mistrial after the prosecutor's cross-examination of Jarvis improperly shifted the burden of proof to the defense. Petition at 18. Specifically, he contends that the prosecution shifted to the defense the burden of producing a model rocket as evidence at trial. <u>Id.</u> During the trial, the State

13

presented evidence that law enforcement officers found an Estes model rocket motor wire in the bomb debris at the victims' house. Id. at 20. The State also introduced Jarvis's receipts from Walmart which showed he had purchased an Estes flight pack, which contained model rocket motors, approximately a month before the incident. Id. According to Jarvis, he testified at trial that he bought an Estes flight pack at Walmart because he occasionally launched model rockets. Id. Jarvis contends the prosecutor improperly asked him why he had not "produced" the model rocket that he used with the flight pack from Walmart. Id. at 23. At trial, counsel objected to the question asked by the prosecutor and moved for a mistrial on the ground that the question improperly shifted the burden of proof to the defense. Id. The trial court denied the motion. Id. Jarvis raised this issue on direct appeal, Docs. 29 at 53-60; 32-1 at 53-60; the State filed an amended answer brief, Doc. 30 at 13-28; and the First DCA affirmed Jarvis's convictions per curiam, Doc. 32-2 at 2.

In its amended appellate brief, the State addressed this claim on the merits, Doc. 30 at 13-28; therefore, the appellate court may have affirmed Jarvis's convictions based on the State's argument. If the appellate court addressed the merits of the claim, the state court's adjudication is entitled to deference under AEDPA. After a review of the record and the applicable law,

14

the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law and did not involve an unreasonable application of clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Jarvis is not entitled to relief on the basis of this claim.

Even assuming that the state court's adjudication of the claim is not entitled to deference, Jarvis's claim of trial court error is without merit. A prosecutor cannot make comments or ask questions that improperly shift the burden of proof to a defendant. See United States v. Bernal-Benitez, 594 F.3d 1303, 1315 (11th Cir. 2010). However, if a defendant chooses to testify at trial, the prosecutor is entitled to cross-examine him. United States v. Demarest, 570 F.3d 1232, 1242 (11th Cir. 2009). "[C]ross-examination necessarily entails testing the plausibility of a defendant's account." Id.

Jarvis objects to the following exchange:

> Q   It's an expendable item but the rocket can be reused, right?
>
> A   That is correct, it goes up and comes down with a parachute or streamer, depending on the size of the rocket.

Q    You used it and you did this some time in December, right, of 2000?

A    October, November, December, yes.

Q    Where is the rocket?

A    I don't know, I've been here in Jacksonville, my stuff has been packed up.

Q    Well you're saying it's in your house?

A    The house isn't there any more, so no, it's not.

Q    Well, where was it on January 14, 2001?

A    I had a duffel bag that I kept rocket supplies with because I didn't launch them in my house, it was all wooded and treed and things would get hung up in the trees. There was a field on the northside of town that I would go to and launch them, and took Christopher with me, about a mile away, and that was where I launched them. And so transporting in my car the bag was in my car on December and January 14th.

Q    The bag is in your car, which car, the Buick?

A    The Buick. The Chevrolet was at the repair lot.

Q    All right. So the police have your bag full of rockets?

A    I don't think so, no.

Q    Were they returned to you?

A    They were not.

16

Q       Were they returned to your lawyers?

A       They were not.

Q       You've been incarcerated but you have lawyers
        working for you, right?

A       Yes, sir.

Q       <u>If those rockets exist why haven't you produced
        them for us here?</u>

A       They were packed up, I guess, with all the rest
        of my household goods. I was – my house was
        searched on January 14th, my arrest did not
        occur until about five weeks later. That Buick I
        used for all kinds of things, moving around, I
        took the bag out of my Buick, brought them into
        the house, I don't know where they are, if they
        were packed up with the rest of the household
        goods.

Doc. 17-1 at 21-22 (emphasis added).

The prosecutor did not improperly shift the burden of proof to the

defense. He permissibly cross-examined Jarvis about the plausibility of

Jarvis's version of events. Jarvis testified on direct examination that he bought

the flight pack because he launched model rockets in a field near his house

possibly "at the end of December, between Christmas and New Years." Doc. 14-

6 at 15. He then stated he was uncertain about the date. <u>Id.</u> He noted the flight

packs act as "refills" for the model rocket. <u>Id.</u> Jarvis also explained he became

17

interested in model rockets because he used to launch them with his stepson, Christopher Janes. Doc. 14-7 at 16-17. By testifying that he bought the flight pack to launch a model rocket around the time of the incident and describing the flight packs as "refills," Jarvis opened the door to questions about the location of the model rocket he used with the flight pack purchased from Walmart. Therefore, the First DCA reasonably could have concluded that the prosecutor appropriately tested the plausibility of Jarvis's account on cross-examination, and the trial court did not err when it denied Jarvis's motion for mistrial.

Even assuming the prosecutor improperly questioned Jarvis, he cannot demonstrate the error substantially or injuriously affected the jury's verdict. After the trial court denied Jarvis's motion for mistrial, the court nevertheless ordered the prosecutor not to suggest in his closing arguments that Jarvis had any burden of proof. Doc. 21-1 at 22-24. The State complied with the court's instruction in its closing arguments. Docs. 22-1 at 4-17; 26 at 7-30. Moreover, the jury instructions included the following language:

> The constitution requires the State to prove its accusations against the defendant. It is not necessary for the defendant to disprove anything. Nor is the defendant required to prove his innocence. It is up to the State to prove the defendant's guilt by evidence.

18

Doc. 11-3 at 15. This instruction cured any prejudice from the prosecutor's question because a jury is presumed to follow jury instructions. See United States v. Simon, 964 F.2d 1082, 1087 (11th Cir. 1992) ("[T]he prejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof."). On this record, Jarvis has failed to demonstrate the error, if any, substantially influenced the jury's verdict. Therefore, he is not entitled to federal habeas relief as to the claim alleged in ground one.

## B. Grounds Two and Seven

### 1. Ground Two

Next, Jarvis asserts that the trial court erred when it admitted a label on a wire located in the bomb debris which reflected that it was found in the bathroom of the victim's house. Petition at 31. Jarvis contends the label constituted hearsay, and the trial court admitted the label in violation of Crawford v. Washington. Id. at 18, 27. The State submitted items recovered in the bomb debris as evidence during trial. Id. at 26-27. Jacksonville Sherriff's Office (JSO) Detective Raymond Godbee testified about the process law enforcement officers used to search for items in the bomb debris. Id. Officers would shovel debris inside the house and take the debris to sifting tables. Id.

at 27. They would sift the debris and bring items of significance to Detective Godbee who would photograph and package the items. Id. Counsel objected when Detective Godbee identified where officers found certain items based upon his reliance on the labels placed on those items. Id. Counsel argued the labels constituted hearsay because Detective Godbee did not personally know where the specific officer found any item. Id. The trial court overruled counsel's objection, noting that "this was a 'classic business records type setting, the business of collecting evidence.'" Id. at 29 (record citation omitted). Jarvis contends that the trial court violated his Sixth Amendment right to confrontation by permitting the State to admit evidence that the wire came from the bathroom without requiring the State to call the officers who shoveled and sifted the debris in the bathroom. Id. at 18. Jarvis raised this issue on direct appeal, Docs. 29 at 60-68; 32-1 at 60-68; the State filed an answer brief, Doc. 30 at 28-40; and the First DCA affirmed Jarvis's convictions per curiam, Doc. 32-2 at 2.

In its amended appellate brief, the State addressed this claim on the merits, Doc. 30 at 28-40, and argued Jarvis's hearsay objection did not violate the principles set forth in Crawford, id. at 38-39. Therefore, the appellate court may have affirmed Jarvis's convictions based on the State's argument. If the

20

appellate court addressed the merits of the claim, the state court's adjudication is entitled to deference under AEDPA. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Jarvis is not entitled to relief on the basis of this claim.

Even assuming the appellate court's adjudication of the claim is not entitled to deference, Jarvis's claim is without merit. The Sixth Amendment provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. Amend. VI. A defendant's Sixth Amendment right to confrontation forbids the government from admitting the testimonial statement of a witness who does not appear at trial unless the witness is unavailable to testify, and the defendant had a prior opportunity for cross-examination. <u>Crawford</u>, 541 U.S. at 53-54. The Supreme Court has defined testimonial statements as "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" <u>Id.</u> at 52. Examples

include statements made during custodial examinations, affidavits, and prior testimony. Id. at 51-52.

Here, the State called JSO Detective Godbee to testify about the process by which law enforcement searched the debris for evidence. Detective Godbee stated JSO had employed him as an evidence technician for approximately fourteen years, and he had processed "thousands" of crime scenes during that time. Doc. 12-8 at 150-51. Detective Godbee supervised the processing of the crime scene in the instant case. Doc. 12-9 at 14-15. He testified that agents from the Federal Bureau of Investigation (FBI), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Florida's Fire Marshal's Office, and JSO assisted in processing the scene over a period of four days. Doc. 12-8 at 166-67. According to Detective Godbee, officers assigned to a particular room in the house would shovel the debris from that area into plastic bins and bring the plastic bins to a sifting table in the driveway labelled with the corresponding room. Doc. 12-9 at 16. Another officer would sift the debris and give items of potential evidentiary value to Detective Godbee. Doc. 12-8 at 167. Detective Godbee authored a report that detailed the names of the officers who worked in each room of the crime scene and their roles in recovering the items. Docs. 12-8 at 183; 12-9 at 15. He instructed officers processing the scene that if they

crossed into different areas, they needed to notify Detective Godbee so he could record it. Doc. 12-9 at 15.

Detective Godbee testified that he would place each item of potential evidentiary value found by officers on a piece of cardboard labelled with the room corresponding to the room on the sifting table, and he photographed the item. Docs. 12-8 at 169; 12-9 at 16-17. Detective Godbee then packaged the items in cannisters. Doc. 12-9 at 17. He testified each room had its own cannister or cannisters, and he labelled the cannister with the name of the particular room. Id. Detective Godbee later sent the cannisters to the ATF lab for analysis. Docs. 12-8 at 169-70; 12-9 at 17. The ATF lab repackaged certain items that it identified as evidence and returned the items to their cannisters. Doc. 12-9 at 18. ATF returned the evidence to Detective Godbee, who repackaged and labelled the items based on the cannisters from which he took them. Docs. 12-8 at 177, 181-82; 12-9 at 18.

Based on this evidence, the trial court did not err when it allowed Detective Godbee to testify about the wire's location because his testimony did not violate Jarvis's right to confront witnesses pursuant to Crawford. Detective Godbee composed the label and testified based upon his personal observation of and participation in processing the scene. Detective Godbee initially

packaged the items in the canisters corresponding to specific rooms before sending them to ATF. Doc. 12-9 at 17-18. When he repackaged them, Detective Godbee identified the room on the label based on the cannisters from which he took the items. Docs. 12-8 at 181-82; 12-9 at 18. Detective Godbee testified he knew where the items came from inside the house based on that process. Doc. 12-9 at 18-20. Therefore, testimony from Detective Godbee about the wire's location was not hearsay because it had a basis in his personable observation of and participation in the recovery process. See United States v. Sanjar, 876 F.3d 725, 740 (5th Cir. 2017) (rejecting defendant's argument that supervising agent offered hearsay testimony when he testified a binder was found in the defendant's office because, even though he did not seize the binder, he supervised the search and he knew the binder's location based on labels written by other agents).

Further, Detective Godbee testified at trial and Jarvis had the opportunity to cross-examine him. Detective Godbee not only had extensive knowledge of the process used to sift through the debris, but also participated in it by photographing and packaging items in cannisters. Detective Godbee testified to this process, and the defense had a thorough opportunity for cross-examination. During his initial voir dire examination, counsel questioned

Detective Godbee about his "33 page report," and Detective Godbee's involvement in the recovery process. Doc. 12-8 at 183-87. On cross-examination, in the presence of the jury, counsel questioned Detective Godbee extensively about the packages and their labels. Doc. 12-9 at 76-80. Detective Godbee admitted that he did not personally find the wire in the bathroom, but that he recovered the wire from the sifting table with a label that identified it as containing debris from the bathroom. Id. at 82-83. Therefore, Jarvis had an adequate opportunity to cross-examine Detective Godbee, see id. at 64-94, and the admission of testimony from Detective Godbee about the wire's location did not violate Jarvis's rights pursuant to Crawford.

Even assuming the trial court improperly admitted evidence of where the wire was located, the error did not substantially affect the jury's verdict. While Jarvis argues the wire's location "was crucial to the State's case," Petition at 18, the Court is not so convinced, and further finds other significant evidence demonstrated Jarvis murdered the victim. The State theorized that Jarvis delivered a bomb to the victim, his ex-wife, because he was angry about the money that he owed her pursuant to their marriage dissolution agreement. The State argued that Jarvis made a pipe bomb, wrapped it in paper, and placed it inside a green plastic tackle box. According to the State, Jarvis glued

BBs to the pipe and placed condoms filled with gasoline inside the tackle box. He then wrapped the tackle box in Christmas paper.

The surviving victims, Marjorie Harris and Daniel Showalter, testified that the bomb was inside a tackle box wrapped in Christmas paper with angels and stars on it. Docs. 12-7 at 143-44; 12-8 at 33, 35. Showalter testified he smelled gasoline after the bomb detonated. Doc. 12-8 at 40. Detective Godbee also testified that he smelled gasoline at the scene. Id. at 155. A forensic chemist from ATF conducted tests on Showalter's sweater which confirmed the presence of gasoline. Docs. 12-8 at 153-54; 13-1 at 47-50.

Officers recovered fragments of wrapping paper, a green plastic tackle box, pieces of galvanized Grinnell pipe, batteries, a Radio Shack battery holder, and BBs in the debris. Doc. 12-10 at 92, 103, 106, 109-11, 151-57, 167-68, 170. Susan Horne, a manager at Radio Shack, testified that a man, who smelled of gasoline, purchased wire and alligator clips at her store between November and December 2000. Doc. 13-1 at 127, 129. She further testified that he asked her about plumbing stores in the area, so she referred him to the Ace Hardware in Folkston, Georgia. Id. at 129-30, 132. Horne observed a white panel station wagon, a blue station wagon, and pickup trucks in the parking lot at that time. Id. at 131. Two weeks later, the same man returned to the store and purchased

a Radio Shack catalog. Id. at 132. Presented with a photospread, Horne identified Jarvis as the customer in both interactions. Id. at 135-36, 151-52. Investigators determined the Ace Hardware in Folkston sold galvanized Grinnell pipe at the relevant time. Id. at 155-56. Also, investigators discovered a Radio Shack catalog in Jarvis's vehicle, a blue 1984 Chevrolet Station Wagon. Doc. 12-10 at 9.

In the search of Jarvis's house, officers recovered two receipts for successive transactions at Walmart on December 19, 2000. Doc. 12-9 at 114. Jarvis had sufficient funds in his checking account to pay for the items on both receipts by check; however, he only paid for the items on the first receipt by check and paid for the items on the second receipt in cash. Docs. 12-9 at 163-64; 13-1 at 193, 195-96; 13-2 at 45, 47-48. The items on the second receipt included an Estes model flight pack, super glue, tape, condoms, and wrapping paper. Docs. 13-1 at 195-96; 13-2 at 7-8. The UPC for the wrapping paper on Jarvis's receipt corresponded to five different types of wrapping paper from one manufacturer, Cleo. Doc. 13-4 at 59. Each of the five specific wrapping papers depicted angels. Id. Investigators matched one of the five types of wrapping paper to the fragments of paper recovered from the scene. Id. at 62, 80-86.

Showalter identified that same wrapping paper as the paper wrapped around the bomb. Doc. 12-8 at 33-34.

Officers found CD-ROMs containing Jarvis's personal information hidden in a dresser drawer at his then-girlfriend's house. Doc. 12-9 at 125. Jarvis ultimately admitted he owned the CD-ROMs and had hidden them from the officers. Doc. 14-6 at 17, 19. FBI Agent Byron Thompson testified the CD-ROMs contained instructions on how to make bombs, information about the Unabomber and the Oklahoma City bombing, and a list of America Online (AOL) users with bomb references in their profiles. Doc. 13-4 at 141-57. Agent Thompson also testified that he found records of searches for "bomb" or bomb-like phrases on a computer from Jarvis's workplace. Id. at 98. Additionally, Jarvis's coworker testified he saw Jarvis viewing a website about bombs on a computer at work. Doc. 13-3 at 97-98.

Mary Spohn, Jarvis's friend, testified that Jarvis expressed an interest in bombs on multiple occasions and suggested delivering a bomb to his ex-wife, one of the victims. Doc. 13-2 at 81-83, 85-86. Spohn recalled a specific conversation with Jarvis during which he detailed how he would construct a bomb. He described enclosing a bomb that included gasoline, chemicals, batteries, and a rocket igniter inside a green plastic tackle box. Id. at 82-83.

28

Jarvis also suggested he would wrap the bomb and the tackle box in paper. Id. at 83.

Spohn and Wendy Lucas, the victim's friend, testified Jarvis would leave "gifts" for the victim. Docs. 13-2 at 79-80; 13-3 at 26-28. Lucas testified these gifts included lilies[7] with their heads cut off, a knife inside of a necklace box, and a picture of the victim torn into pieces. Doc. 13-3 at 26-28. Both witnesses testified that Jarvis expressed animosity towards the victim about their divorce and about the money that he owed to the victim as set forth in the marriage dissolution agreement. Docs. 13-2 at 87-89; 13-3 at 22-23. Paola Parra, the victim's divorce attorney, confirmed the agreement provided Jarvis would pay alimony, child support, $1,000 in attorney's fees, and a $28,000 lump sum payment to the victim. Doc. 13-2 at 165-67, 170-71, 173. Given the foregoing evidence, the Court finds the introduction of the wire's location into evidence did not have a substantial effect on the jury's verdict.

Moreover, counsel only objected to admitting the wire's label into evidence, not to admitting the wire itself. Doc. 12-9 at 199. Other evidence besides the wire's label linked it to the bomb and to Jarvis. Christopher Janes, the victim's son, testified that he did not bring any model rockets with him

---

[7] The victim's name was Lillian Jarvis. Doc. 11-1 at 162.

29

when he moved to the house. Doc. 12-8 at 73, 82. Marjorie Harris also confirmed no one in the house used model rockets, and Janes did not have an interest in model rockets at the time. Doc. 12-7 at 159, 161-62. Investigators determined the wire was part of an Estes model rocket motor sold in "flight packs." Docs. 12-10 at 114-17, 140-41; 13-1 at 36, 41-42. One of the Walmart receipts showed Jarvis paid cash for an Estes flight pack on December 19, 2000. Docs. 13-1 at 195-96. Based on this evidence, the jurors reasonably could have concluded that the wire formed part of the bomb without considering the wire's label. On this record, Jarvis fails to persuasively argue that the wire's location inside the bathroom was not crucial to the State's case.[8] Accordingly, Jarvis is not entitled to federal habeas relief on the claim raised in ground two.

## 2. Ground Seven

Jarvis argues that a change in the law set forth in Crawford warrants the remand of his case. Petition at 19. He contends the trial court denied his hearsay objection pursuant to Ohio v. Roberts, 448 U.S. 56 (1980), which the Supreme Court overturned in Crawford, a case decided while Jarvis's case was

---

[8] None of the items' locations were a feature of the State's case. Notably, Detective Godbee testified officers recovered other key pieces of evidence, the fragments of wrapping paper, in a bedroom and the backyard of the house. Doc. 12-9 at 50, 53-54.

still pending on direct appeal. Id. at 60-61. Jarvis contends when he brought a change of law claim in his Rule 3.850 Motions, the postconviction court determined Crawford did not apply retroactively to his case, "ignoring the claims that [Jarvis's] case was 'still in the pipeline' when Crawford was decided." Id. at 61.

Jarvis raised a substantially similar claim in state court as ground twenty-eight of his Rule 3.850 Motions. Docs. 35-2 at 44-45; 35-3 at 45-46.

In denying relief on ground twenty-eight, the circuit court explained:

> Defendant again alleges he is entitled to relief based upon a change in the law as set forth by the United States Supreme Court in Crawford v. Washington, 541 U.S. 36 (2004), which was issued after his conviction. As noted above, an alleged change in the law is only cognizable in a Rule 3.850 proceeding if it constitutes a development of fundamental significance. Witt,[9] 387 So. 2d at 931. To fall within this category, the change must either "place beyond the authority of the state the power to regulate certain conduct or impose certain penalties," or be of "sufficient magnitude to necessitate retroactive application." Id. at 929. The Florida Supreme Court has held that Crawford does not fall into the first category, and does not apply retroactively. Chandler v. Crosby, 916 So. 2d 728, 729 (Fla. 2005). Another case cited by Defendant, Davis v. Washington, 547 U.S. 813, 828-34 (2006), merely clarified whether an interrogation was a testimonial statement under Crawford. It also does not constitute a change in the law under Witt.

---

[9] Witt v. State, 387 So. 2d 922 (Fla. 1980).

Defendant also cites to <u>Nurse v. State</u>, 932 So. 2d 290 (Fla. 2d DCA 2005), in support of his argument in this ground. However, <u>Nurse</u> was issued by a district court of appeal. Even if it set forth a change in the law, it is not the type of change cognizable in a 3.850 motion because it does not emanate from the Florida Supreme Court or the United States Supreme Court. <u>Witt</u>, 387 So. 2d at 931. Finally, Defendant also cites to <u>State v. Johnson</u>, 982 So. 2d 672 (Fla. 2008). However, <u>Johnson</u> does not set forth a change in the law; instead, it applies the changes previously established in <u>Crawford</u>, which does not apply retroactively. <u>Johnson</u>[,] 982 So. 2d at 673; <u>Chandler</u>, 916 So. 2d at 729. Accordingly, Defendant['s] Ground Twenty-Eight is denied.

Doc. 39-1 at 94-95. The First DCA per curiam affirmed the denial of relief without a written opinion. Doc. 41-5 at 2.

"[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final . . . ." <u>Griffith v. Kentucky</u>, 479 U.S. 314, 327 (1987). The Supreme Court decided <u>Crawford</u> on March 8, 2004. 541 U.S. at 36. Six months earlier, on October 10, 2003, a jury found Jarvis guilty of all counts. Doc. 11-3 at 23-27. Jarvis appealed and the First DCA did not affirm his convictions and sentences until December 22, 2005. Doc. 32-2 at 2. Accordingly, <u>Crawford</u> applied to Jarvis's case when it was on direct appeal.

32

In light of the fact that the postconviction court's denial of relief rested on finding <u>Crawford</u> was not applicable to Jarvis's case and because the First DCA did not provide a written opinion, the Court presumes the First DCA affirmed the denial of relief based on the postconviction court's finding. <u>Wilson</u>, 138 S. Ct. at 1192. However, since <u>Crawford</u> applied to Jarvis's case on direct appeal, it does not appear as if deference should be owed to this adjudication. Nevertheless, Jarvis is not entitled to relief because he cannot demonstrate prejudice.

On federal habeas review, harmless error is determined by applying the standard set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993).

> On collateral review, we apply the harmless-error standard as articulated in <u>Brecht v. Abrahamson</u>, which dictates that a federal court may grant habeas relief on account of a constitutional error only if it determines that the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted); <u>see</u> <u>Trepal v. Sec'y, Fla. Dep't of Corr.</u>, 684 F.3d 1088, 1110–12 (11th Cir. 2012) (outlining <u>Brecht</u> analysis on federal habeas review), <u>cert. denied</u>, <u>Trepal v. Crews</u>,–U.S.–, —— U.S. ——, 133 S.Ct. 1598, 185 L.Ed.2d 592 (2013). Under the <u>Brecht</u> standard, the petitioner should prevail when the record is "so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error." <u>O'Neal v. McAninch</u>, 513 U.S. 432, 437, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995); <u>see</u> <u>Caldwell v.</u>

> Bell, 288 F.3d 838, 842 (6th Cir. 2002) ("When faced with a Sandstrom error a court should not assume it is harmless but must review the entire case under the harmless-error standard the Supreme Court most recently expounded in Brecht...."). "To show prejudice under Brecht, there must be more than a reasonable possibility that the error contributed to the conviction or sentence." Trepal, 684 F.3d at 1114 (internal quotation marks omitted).

Owens v. McLaughlin, 733 F.3d 320, 328 (11th Cir. 2013).

Applying Brecht, "a federal constitutional error is harmless unless there is 'actual prejudice,' meaning that the error had a 'substantial and injurious effect or influence' on the jury's verdict." Mansfield v. Sec'y, Dep't of Corr., 679 F.3d 1301, 1307 (11th Cir. 2012) (quoting Brecht, 507 U.S. at 637). "To show prejudice under Brecht, there must be more than a reasonable possibility that the error contributed to the conviction or sentence." Mason v. Allen, 605 F.3d 1114, 1123 (11th Cir. 2010) (internal quotation marks and alteration omitted).

As determined in ground two, Jarvis has not established that the admission into evidence of the label affixed to the wire "had a substantial and injurious effect or influence in determining the jury's verdict." Mansfield, 679 F.3d at 1307. Nor has he shown "more than a reasonable possibility that" any error in admitting the label contributed to the conviction. Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1114 (11th Cir. 2012) ("The question turns on

34

whether the Court can 'say, with fair assurance,' that the verdict 'was not substantially swayed by the error[.]'"). Given the record, Jarvis is not entitled to habeas relief as to the claim in ground seven.[10]

### C. Ground Three

As ground three, Jarvis contends counsel was ineffective because he failed to object to the prosecutors'[11] opening statements and closing arguments. Petition at 18. Jarvis raises five subclaims[12] about opening statements and twenty subclaims about closing arguments. Id. at 38-47.

### 1. Opening Statements

Jarvis contends counsel was ineffective because he did not object to comments during opening statements that inflamed the jurors' passions and did not have evidentiary support. Id. at 38. Jarvis raised a similar claim in

---

[10] To the extent Jarvis asserts the postconviction court erred when it denied ground twenty-eight of his Rule 3.850 Motions, his claim is not cognizable in a petition for writ of habeas corpus. See Quince v. Crosby, 360 F.3d 1259, 1262 (11th Cir. 2004); Mendelson v. Fla. Dep't of Corr., No. 19-10130-J, 2019 WL 3206630, at *2 (11th Cir. May 30, 2019).

[11] Jay Taylor and Jay Plotkin, Esquires, appeared on behalf of the State. Doc. 12-7 at 3. Taylor delivered the State's opening statement and initial closing argument. Docs. 12-7 at 86; 22-1 at 4. Plotkin delivered the State's rebuttal closing argument. Doc. 26 at 7.

[12] The subclaim numbers correspond to the numbers that Jarvis assigns to the comments in the Petition.

state court as ground ten of his Rule 3.850 Motions. Docs. 35-2 at 15-16; 35-3

at 16-17. In denying relief , the circuit court explained:

> Defendant alleges counsel was ineffective for failing to object to a number of allegedly improper comments by the prosecutor during his opening statement. Initially, this Court notes that to prevail on such a claim, a defendant must "show that the comments were improper or objectionable and that there was no tactical reason for failing to object." Stephens v. State, 975 So. 2d 405, 420 (Fla. 2007). Further, a defendant "must demonstrate that the comments deprived 'the defendant of a fair and impartial trial, materially contribute[d] to the conviction, [were] so harmful or fundamentally tainted as to require a new trial, or [were] so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise." Id. [(quoting Spencer v. State, 645 So. 2d 377, 383 (Fla. 1994)).
>
> This ground consists of five subclaims. In his first subclaim, Defendant alleges that counsel should have objected when the prosecutor stated that the victim's last breaths were "filled with the smoke of [the defendant's] hatred." Similarly, in the second subclaim, he alleges that counsel should have objected when the prosecutor indicated that Christmas that year was "born of hate." Defendant alleges that these statements are contrary to the evidence because there was not any evidence presented during the trial that Defendant hated his ex-wife, and because it was not Christmas-time. This Court disagrees. The bombing took place within two weeks of Christmas of 2000. In addition, the State presented testimony that Defendant was angry about the money he owed his ex-wife because of their divorce, and had made prior threats to kill her. Because these comments were

consistent with the evidence established during the trial, they were not improper and, therefore, counsel's failure to object to them did not constitute ineffective assistance of counsel. See Gonzalez v. State, 990 So. 2d 1017, 1025 (Fla. 2008). Further this Court finds that these statements were not so inflammatory so as to require a new trial.

In his third subclaim, Defendant alleges that counsel should have objected when, during his opening statement, the prosecutor referred to a wire found at the scene of the crime and stated that it had the same chemical composition as one linked to Defendant. As discussed in more detail in Ground Four above, the evidence presented at trial supports this statement. Therefore, counsel was not ineffective and Defendant cannot establish prejudice.

In his fourth subclaim, Defendant alleges that counsel should have objected to the prosecutor's statement that Defendant had a CD-ROM with approximately seventy pages of material related to the Oklahoma City bombing. Defendant argues that a portion of this exhibit was later redacted and that the State was aware that this was likely to occur when the statement was made. At trial, the court only allowed approximately forty pages of the exhibit into evidence. However, in light of all of the other circumstantial evidence admitted against Defendant (as detailed in Ground Two above), this Court finds that this comment by the prosecutor was not so inflammatory such that it might have influenced the jury to reach a more severe verdict. Gonzalez, 990 So. 2d at 1025. Therefore, Defendant is unable to establish prejudice. Strickland, 466 U.S. at 687.

Finally, in his fifth subclaim, Defendant alleges that counsel should have objected when, during his

opening statement, the prosecutor advised the jury that the explosion almost knocked Defendant's stepson, Christopher Janes, out of bed. Mr. Janes actually testified that he was in bed sleeping when the explosion occurred, and that it caused the shelves to fall off his wall, hitting him in the head. However, this Court does not find that this discrepancy was so significant so as to establish prejudice. In light of the evidence presented, it is unlikely that, had counsel objected, the outcome of the trial would have been different. Strickland, 466 U.S. at 687. Further, prior to opening statements, the trial court instructed the jurors that what the attorneys were about to say was not evidence: "The opening statements gives the attorneys a chance to tell you what evidence they believe will be presented during the trial, though what they say is not evidence and you are not to consider it as such." In light of this instruction, this Court declines to find that Defendant was prejudiced. Based on all of the above, the allegations raised in Defendant's tenth ground are denied.

Doc. 39-1 at 34-36. The First DCA per curiam affirmed the circuit court's denial of relief without a written opinion. Doc. 41-5 at 2.

To the extent that the First DCA rejected the claim of deficient performance with respect to the opening statement on the merits,[13] the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the

---

[13] Throughout this Order, in looking through the appellate court's per curiam affirmance to the circuit court's "relevant rationale," the Court presumes that the appellate court "adopted the same reasoning." Wilson, 138 S. Ct. at 1194.

applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Jarvis is not entitled to relief on the basis of this ineffectiveness claim.

Even assuming the appellate court's adjudication of the claim is not entitled to deference, Jarvis's ineffectiveness claim is without merit because the record supports the postconviction court's conclusion. In subclaims one and two, Jarvis specifically objects to the following comment: "The last breaths that Lillian Jarvis took on this earth were filled with the smoke of his hatred. Christmas that year for Lillian Jarvis was born of hate and born of greed." Doc. 12-7 at 86-87. According to Jarvis, the State did not present evidence that he hated the victim, and the incident did not occur during Christmas. Petition at 38-39.

Counsel was not ineffective when he failed to object to the prosecutor's comment. The State presented multiple witnesses who testified Jarvis expressed anger towards the victim, his ex-wife, about their divorce proceedings and money that he owed the victim pursuant to the marriage

dissolution agreement. Docs. 12-7 at 158; 13-2 at 71-72, 75, 79-80, 85-89, 147; 13-3 at 22-24, 26-28. Moreover, while Jarvis did not deliver the bomb during Christmas, the incident occurred on January 6, 2001, within approximately two weeks of Christmas. Doc. 11-1 at 162-64. Jarvis also wrapped the bomb in Christmas paper. Docs. 12-7 at 143-44; 12-8 at 33-34. Therefore, the prosecutor's statement constituted a fair comment on the evidence that he expected to present at trial and was not so inflammatory as to necessitate a new trial. Accordingly, counsel was not ineffective for failing to make a meritless objection. See Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1142 (11th Cir. 2005) (holding counsel was not ineffective for failing to raise a meritless argument); Bolender v. Singletary, 16 F.3d 1547, 1573 (11th Cir. 1994) (noting that "it is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").

In subclaim three, Jarvis asserts counsel was ineffective when he did not object to the prosecutor's statement that the wire found at the scene was "made of the exact same size, type, shape and chemical components" as an Estes model rocket motor wire. Doc. 12-7 at 97. Jarvis contends "the 'tests' which supported this conclusion were not ever authenticated for the court." Petition at 39. However, the record reflects that the prosecutor made a proper comment

on the evidence that he expected to present at trial. See United States v. Lizon-Barias, 252 F. App'x 976, 978 (11th Cir. 2007) ("An opening statement gives counsel the opportunity to state what evidence will be presented in order to make it easier for the jurors to understand what is to follow . . . ."). Robert Reed, a forensic chemist at ATF, visually identified the wire from the scene as the same type of wire as an Estes model rocket motor wire and compared the wires' measurements. Doc. 12-10 at 141. He also testified that he performed chemical tests on the wire to determine it had the same chemical composition as an Estes wire.[14] Id. at 144-49. Edwin Brown, an Estes employee, also testified that the wire from the scene appeared to be an Estes wire. Doc. 13-1

---

[14] In its order denying Jarvis's Rule 3.850 Motions, the postconviction court rejected Jarvis's claim that counsel was ineffective when he did not object to testimony from Reed pursuant to Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), stating:

> Under Florida law, expert opinions which involve "new or novel scientific techniques" must satisfy the standard set forth in Frye. Spann v. State, 857 So. 2d 845, 852 (Fla. 2003). "By definition, the Frye standard only applied when an expert attempts to render an opinion that is based upon new or novel scientific techniques." Id. [(quoting] U.S. Sugar Corp. v. Henson, 823 So. 2d 104, 109 (Fla. 2002)). This Court is not convinced that the chemical analysis utilized by Mr. Reed, based on X-ray technology, is new or novel.

Doc. 39-1 at 20.

at 41-42. This evidence was not of questionable admissibility, and the prosecutor properly commented on the evidence that the State expected to present at trial. Accordingly, counsel was not ineffective for failing to make a meritless objection. See Diaz, 402 F.3d at 1142; Bolender, 16 F.3d at 1573.

As subclaims four and five, Jarvis asserts counsel was ineffective when he did not object to the prosecutor's statement that Jarvis had seventy pages of information about the 1995 Oklahoma City bombing on CD-ROMs. Petition at 39. Jarvis contends the trial court ultimately limited the content "to many fewer pages" of information that the State could present to jurors. Id. According to Jarvis, the prosecutor knew the trial court would redact the information, and his comment "was irresponsible and was an act designed only to shock the jury." Id. Jarvis also alleges counsel was ineffective when he did not object to the following comment: "Chris Janes, Lillian Jarvis' son from the previous marriage, was sleeping in a bedroom just feet away where he was almost knocked out of bed by the explosion." Doc. 12-7 at 93. Jarvis contends Christopher Janes did not testify to that fact. Petition at 40. Rather, he testified that a shelf fell off the wall and hit him when he was sleeping. Id. at 40. Jarvis argues the prosecutor exaggerated the evidence to mislead the jurors. Id.

42

Here, even if the prosecutor's comments constituted improper exaggerations of the evidence and assuming counsel performed deficiently for failing to object,[15] Jarvis has not demonstrated any resulting prejudice from counsel's failure to object. As such his ineffectiveness claims are without merit. Based on the significant amount of evidence presented against Jarvis as outlined by the Court in ground two, a reasonable probability does not exist that the outcome of the case would have been different if counsel had acted as Jarvis claims he should have. Therefore, Jarvis is not entitled to federal habeas relief on ground three as it relates to the prosecutor's opening statements.

## 2. Closing Arguments

With respect to the prosecutors' closing arguments, Jarvis asserts counsel was ineffective because he did not object to comments during closing arguments that inflamed the jurors' passions, improperly referred to Jarvis as a liar, bolstered the credibility of State witnesses, did not have evidentiary support, and "denigrated [Jarvis's] right to seek a fair trial." Petition at 40.

---

[15] During the evidentiary hearing on Jarvis's Rule 3.850 Motions, counsel testified that his general trial strategy "is to win the jury over starting with jury selection." Doc. 36-1 at 30. Counsel stated that he objects if "repeated violations" occur during the examination of a witness or closing arguments, but otherwise he does not want to alienate the jury. Id. In this context, counsel's failure to object likely constituted a reasonable, strategic decision to not alienate the jury at the start of trial. See Fleming v. Kemp, 748 F.2d 1435, 1451 (11th Cir. 1984).

Jarvis raised a similar claim in state court as ground eleven of his Rule 3.850 Motions. Docs. 35-2 at 16-21; 35-3 at 17-22. In denying relief, the circuit court examined and rejected Jarvis's claim of ineffectiveness as to each allegedly improper comment from closing arguments. Doc. 39-1 at 36-53. The First DCA per curiam affirmed the denial of relief without a written opinion. Doc. 41-5 at 2.

To the extent that the First DCA denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Jarvis is not entitled to relief on the basis of this ineffectiveness claim.

Even assuming the appellate court's adjudication of the claim is not entitled to deference, Jarvis's ineffectiveness claim with regard to the closing arguments is without merit because the record supports the postconviction court's conclusions.

### a. Comments that Inflamed the Jurors' Passions

In subclaims one, seventeen, and nineteen, Jarvis argues counsel was ineffective when he did not object to the following comments:

> You will remember in opening statements that I told you that <u>Christmas of the year 2000 was born of hate and born of greed for Lillian Jarvis</u>. . . .
>
>    . . . .
>
> A bomb, a pipe bomb is a personal way to kill someone. <u>It is killing because of spite, it is killing because of emotion</u>, it is not a crime that leaves no evidence, it is a crime that makes evidence, it is a crime that plays out in front of you and through these witnesses and this evidence you have heard exactly what this man did.
>
>    . . . .
>
> Why can't he admit he bought the angel dove wrapping paper? Because it is the angel dove wrapping paper that we know beyond any doubt whatsoever he used to wrap his implement of death. <u>William Jarvis took the symbol of peace and what is good in the world and he turned those sweet angels into angels of death.</u>
>
>    . . . .
>
> That cloak of innocence, ladies and gentlemen, has been shattered, <u>that cloak of innocence is now stained with the blood of Lillian Jarvis, with the blood of Dan Showalter, with the blood of Marjorie Harris</u>. . . .
>
>    . . . .
>
> Don't forget one thing when you deliberate in this case, a marriage, a break up, all the emotions, all of the personal animosity that might go with that there are two parties to that, unfortunately you have only been

> able to hear from one, <u>Lillian Jarvis could not come in
> here and tell you about the man she said she would not
> want to be her husband any more</u> . . . .

Docs. 22-1 at 5; 26 at 7-8, 12-13, 17 (emphasis added).[16] Jarvis argues counsel also was ineffective when he did not object to the prosecutor referencing the pipe bomb as Jarvis's "death pipe" during rebuttal argument. Doc. 26 at 28. According to Jarvis, the comments inflamed the jurors' passions and attempted to evoke sympathy from the jurors. Petition at 40-41, 46-47.

It is true that prosecutors must not make "[i]mproper suggestions, insinuations, and assertions calculated to mislead or inflame the jury's passions . . . ." <u>United States v. Lopez</u>, 590 F.3d 1238, 1256 (11th Cir. 2009). However, none of the above comments run afoul of that prohibition. Therefore, counsel was not ineffective for failing to object. Moreover, given the substantial amount of circumstantial evidence implicating Jarvis, he fails to show that the outcome of the trial would have been different if counsel had objected to these comments.

---

[16] The quoted comments are from both the initial closing argument and the rebuttal argument.

### b. Comments Without Evidentiary Support

As subclaim one, Jarvis argues counsel was ineffective when he did not object to the following comment: "Christmas of the year 2000 was born of hate." Doc. 22-1 at 5. According to Jarvis, no evidence demonstrated he hated the victim, and the incident did not occur during Christmas. Petition at 40. The prosecutor made a similar comment during his opening statement, and the Court determined that the comment constituted a fair assessment of the evidence. For those same reasons, the Court finds the prosecutor did not make an improper comment during closing arguments. Accordingly, counsel was not ineffective when he failed to make a meritless objection.

In subclaim five, Jarvis claims counsel was ineffective when he did not object to numerous instances during closing arguments when the prosecutor indicated, "testimony or evidence was an 'exact' match to bomb debris . . . ." Id. at 41. Specifically, the prosecutor referred to a specific plumbing store as the source for a bomb component, but Jarvis alleges no evidence existed that the bomb component came from that store. Id. at 41-42.

The Court finds the prosecutor made a proper comment on a reasonable inference that jurors could draw from the evidence. See United States v. Adams, 339 F. App'x 883, 886 (11th Cir. 2008) ("[A] prosecutor may 'assist the

jury in analyzing, evaluating, and applying the evidence' and, therefore, may 'urge[] the jury to draw inferences and conclusions from the evidence produced at trial.'") (quoting <u>United States v. Johns</u>, 734 F.2d 657, 663 (11th Cir. 1984)). Notably, Radio Shack manager Horne identified Jarvis as a customer who asked her about local plumbing stores in November or December 2001, <u>see</u> Doc. 13-1 at 127, 129-30, 134-36, and Horne referred him to a Folkston Ace Hardware, <u>see id.</u> at 132. Additionally, ATF chemist Reed testified officers found parts of a galvanized Grinnell pipe at the scene. Doc. 12-10 at 88, 92, 103. The State proposed Jarvis used the pipe to construct a bomb. Doc. 13-1 at 84-91. The Folkston Ace Hardware stocked the same item. <u>Id.</u> at 155-56. Given this evidence, the prosecutor could reasonably argue that Jarvis purchased the pipe found in the debris from that "exact plumbing store."

Jarvis also alleges counsel was ineffective when he did not object to the prosecutor referring to the Pyrodex discovered on Daniel Showalter's sweater as the exact type of powder Jarvis discussed with his coworkers. Petition at 42. However, Jarvis's coworkers testified they discussed "black powder" with Jarvis in the fall of 2000. Doc. 13-3 at 93, 108-09. Reed testified Pyrodex is a black powder substitute. Doc. 12-10 at 177-78. Therefore, the prosecutor did not make an improper comment on the evidence.

48

Jarvis asserts counsel was ineffective when he did not object to the prosecutor's statement that Jarvis bought the exact wrapping paper used to wrap the bomb. Petition at 42. According to Jarvis, the UPC for the wrapping paper on his Walmart receipt belonged to five different types of wrapping paper. Id. Therefore, the evidence did not show he purchased the exact wrapping paper used to wrap the bomb. Id. However, the UPC for the wrapping paper on Jarvis's receipt identified five different types of wrapping paper that all depicted angels and came from one manufacturer. Doc. 13-4 at 59. Investigators matched one of the five types of wrapping paper to the fragments of paper recovered from the scene. Id. at 62, 80-86. Daniel Showalter also identified that wrapping paper as the paper used to wrap the bomb. Doc. 12-8 at 33-34. Therefore, the prosecutor's statement constituted a reasonable inference from the evidence. Because each of the above comments had evidentiary support, counsel did not have a basis to make an objection. See Diaz, 402 F.3d at 1142; Bolender, 16 F.3d at 1573.

In subclaim seven, Jarvis contends counsel was ineffective when he did not object to the prosecutor's comment that Jarvis "admitted fabricating complex electrical components and devices." Petition at 42. Jarvis argues the prosecutor mischaracterized the evidence because he only testified to his

familiarity with simple electric circuits. Id. During trial, Jarvis testified to his experience with electrical devices, which included soldering, stripping, and cutting wires for his model trains. Doc. 14-5 at 10-17. Jarvis even testified that he "fabricated" a control box. Id. at 16. Given this testimony, the prosecutor reasonably described Jarvis's experience with electrical devices as complex. Therefore, counsel had no basis to make an objection.

As subclaims seven and fourteen(a), Jarvis alleges counsel was ineffective when he did not object to the prosecutors' inaccurate comments that Jarvis did not love his daughter. Petition at 42, 45. However, Jarvis's daughter testified she had an "unsteady" relationship with her father. Doc. 12-7 at 200. Additionally, the State presented significant evidence that Jarvis delivered the bomb to a house in which his daughter resided. Under the circumstances, the prosecutors' comments constituted a reasonable inference from the evidence. See Adams, 339 F. App'x at 886.

In subclaim nine, Jarvis contends counsel was ineffective when he did not object to the prosecutor's claim that Jarvis "had a three-and-a-half or four-hour 'window' to deliver the package bomb . . . ." Petition at 43. According to Jarvis, the claim confused the jurors because the evidence demonstrated it took Jarvis approximately one hour to drive to the victim's house, "which would

50

close the 'window' to as little as 80 or 90 minutes." Id. Having considered the record, the Court finds the comment did not mislead or confuse the jurors. Jarvis testified he went to sleep around 1:30 a.m. on January 6, 2001, the day of the incident, and did not wake up until approximately 5:00 a.m. that same morning. Doc. 14-5 at 3-4. Jarvis could not account for approximately three-and-one-half hours, between 1:30 a.m. and 5:00 a.m., on January 6, 2001. Consistent with this evidence, the prosecutor suggested Jarvis had three or four hours "to deliver" the bomb. Doc. 22-1 at 13. Delivery time reasonably includes the drive from Jarvis's house to the victim's house. Therefore, the prosecutor properly commented on the evidence when he stated Jarvis had three or four hours to deliver the bomb. Counsel was not ineffective for failing to make a meritless objection. See Diaz, 402 F.3d at 1142; Bolender, 16 F.3d at 1573.

In subclaim thirteen, Jarvis asserts counsel was ineffective when he did not object to the prosecutor's inaccurate description of how Jarvis heard about the victim's death. Petition at 44. During closing arguments, the prosecutor stated: "He said he spoke to Nancy Holmes and she told him about this explosion or this fire on Brompton Court. And what were his words? He said that I immediately knew my wife had been killed." Doc. 26 at 18. Jarvis

51

contends he did not testify that he immediately knew the victim had been killed. Petition at 45. According to Jarvis, the prosecutor improperly implied to jurors that Jarvis immediately knew about the victim's death because he delivered the bomb. Id.

During trial, Jarvis testified his then-girlfriend, Nancy Holmes, called him on January 6, 2001, about the incident:

> Well she told me there had been a fire and an incident and a woman had been killed on Brompton Court. And I made the association that these investigators who are asking me where I had been and told me there had been a fire, I put two and two together and realized my wife or my recent ex-wife had been killed.

Doc. 16-1 at 17. The postconviction court denied subclaim 13 after an evidentiary hearing, stating in pertinent part:

> During the November 4, 2012 evidentiary hearing, Mr. Eler testified that he didn't object to the prosecutor's inaccurate closing statements because his general trial strategy was to avoid alienating the jury and that he "usually [doesn't] object unless there is some fundamental error going on in closing because [he] think[s] it tends to alienate the jury." Mr. Eler further testified that:
>
>> A:   I don't want to underestimate the length of the trial. . . . I mean it was a three-week trial. There were lots of witnesses. I think closing arguments – I mean I don't remember if they took half a day or

52

the whole day. They were several hours. And so one snippet of one comment that goes over a juror's head is not what I'm concerned about. And, frankly, I still don't think that was an improper comment.

As to his latter statement, Mr. Eler testified that he did not object because he thought the prosecutor's statement was actually a "reasonable inference of the evidence," as opposed to a mischaracterization of the evidence. In fact, Mr. Eler testified that he "often say[s] to the jury what I say is not evidence, what the state says is not evidence, go back and remember what you hear[d]."

Therefore, in light of Mr. Eler's testimony, this Court finds that counsel's failure to object was reasonable trial strategy and did not constitute deficient performance. See Chavez,[17] 12 So. 3d at 207. Consequently, this subclaim is denied.

Doc. 39-1 at 49-50 (record citations omitted).

"In assessing an attorney's performance under Strickland, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" Knight v. Fla. Dep't of Corr., 936 F.3d 1322, 1340 (11th Cir. 2019) (quoting Strickland, 466 U.S. at 690). The Court notes that "[t]he Supreme Court has mandated a highly deferential review of

---

[17] Chavez v. State, 12 So. 3d 199, 207 (Fla. 2009).

counsel's conduct, especially where strategy is involved," and "[i]ntensive scrutiny and second-guessing of attorney performance are not permitted." Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994) (citing Strickland, 466 U.S. at 689-90). Indeed, the Eleventh Circuit has instructed that:

> Inquiries into strategic or tactical decisions challenged as ineffective assistance of counsel involve both a factual and a legal component. The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct. By contrast, the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact, so we decide it de novo.

Provenzano v. Singletary, 148 F.3d 1327, 1330 (11th Cir. 1998).

In this case, the postconviction court determined counsel's decision not to object to the comment was strategic. Jarvis has not provided clear and convincing evidence to overcome this factual determination; therefore, under § 2254(e)(1) the Court accepts this factual finding is correct. The Court further finds that counsel's decision not to object to the comment was reasonable. At the evidentiary hearing on Jarvis's Rule 3.850 Motions, counsel testified he does not usually object during closing arguments because it alienates the jury. Doc. 36-1 at 30. Moreover, counsel considered the length of the trial, the length

54

of closing arguments, and the fact that jurors heard Jarvis's testimony about how he had learned of the victim's death to determine that an objection would be inappropriate. Id. at 77. Based on this rationale, the Court finds counsel's strategy was reasonable, and, therefore, counsel did not perform deficiently.

In subclaim fourteen(b), Jarvis also argues counsel was ineffective when he did not object to the following comment: "We know at some time [on January 6, 2001] he was at Brompton Court." Doc. 26 at 22. The Court finds that the prosecutor commented on a reasonable inference that the jury could draw from the evidence. Given the substantial amount of circumstantial evidence suggesting Jarvis murdered the victim as detailed in ground two of this Order, a jury could infer that Jarvis was at the victim's Brompton Court house on January 6, 2001, to deliver the bomb that killed her. Accordingly, counsel was not ineffective when he failed to object to a proper comment. See Diaz, 402 F.3d at 1142; Bolender, 16 F.3d at 1573.

As subclaim fifteen, Jarvis contends counsel was ineffective when he did not object to the following comment:

> He told you [in] his words I can manipulate a wire, he can manipulate a wire, he can manipulate a computer, he can manipulate the truth. Those computers, there was no evidence in all this computer forensic work of any e-mails that [] were sent to him with these attachments about bombs. Well they just disappear in

55

> cyberspace. <u>Nothing disappears in cyberspace or at
> least not much based on what you heard from Byron
> Thompson.</u>

Doc. 26 at 23 (emphasis added). According to Jarvis, Thompson testified about

extracting data from CD-ROMs. Petition at 45-46. Thompson did not testify

"about various email systems, many of which do automatically delete old files."

<u>Id.</u> at 46. Therefore, Jarvis argues the comment misrepresented the evidence

to imply Jarvis's effort to falsify testimony. <u>Id.</u>

Counsel was not deficient for failing to object because the comment did

not misrepresent the evidence. During his testimony, Thompson noted the

difficulty of fully erasing information downloaded from the Internet onto a

computer because of the FBI's forensics capabilities. Doc. 13-4 at 101. He

testified the best means to ensure information can never be found was to

destroy the computer in its entirety. <u>Id.</u> Additionally, even assuming the

comment misrepresented Thompson's testimony, given the substantial amount

of evidence against Jarvis as set forth in ground two, the Court finds the

comment was not prejudicial or so harmful that it contributed to the verdict.

Counsel's failure to object did not prejudice the defense. Accordingly, Jarvis is

not entitled to federal habeas relief.

### c. Comments Impugning Jarvis's Character

As subclaims two, ten, and twelve, Jarvis contends counsel was ineffective when he did not object to comments impugning Jarvis's character or implying Jarvis lied about events. Petition at 41, 43-44. Jarvis contends counsel should have objected to the following comments:

> I found it fascinating, an example, I found it fascinating that Mr. Jarvis sat up here and had an explanation for absolutely everything, absolutely everything, every single tool in his house, every single purchase and the manner of purchase of the items at Wal-Mart, every single piece of evidence he had an answer for. . . . <u>The fact that he had an explanation for everything is evidence of fabrication.</u> What you know to an absolute certainty in this case is that the person who made this bomb is a crafty, meticulous, relentless person. What you know to an absolute certainty is that William Jarvis is that person.
>
> . . . .
>
> This man did not and does not love his daughter. Make no mistake about it. There's a sadness and a tragedy in that but he does not. If you love your daughter you don't set her mother on fire in front of her. If you love your daughter and you have $20,000 in a bank somewhere from a property sale you provide for her, you provide for her education, your provide for her mental health, you provide for her comfort.
>
> <u>This assertion of his is unbelievable and unworthy of your – credit or credibility</u> that he couldn't get that money and couldn't achieve that purpose with all this love he has for his daughter.
>
> . . . .

57

This defendant did not count on the fact that when he testified <u>you would see through his deception, you would see through his fabrication</u> but you can see clearly now.

. . . .

This defendant spoke the truth when he told you that he fabricated his words, fabricated a control box. We knew he's fabricated some different kinds of boxes and <u>we know he's fabricated a lot of things.</u>

. . . .

We know that he is a computer geek, we know you can take computers and make it look like you're on AOL when you're not on AOL and its not that hard to do. He told you [in] his words I can manipulate a wire, he can manipulate a wire, <u>he can manipulate a computer, he can manipulate the truth.</u> . . .

Docs. 22-1 at 12, 16; 26 at 13, 15, 23 (emphasis added).[18]

When considered in context, each comment properly requested the jurors to consider Jarvis's veracity based on his testimony and the evidence. Such argument is not improper. <u>See</u> <u>United States v. Rivera</u>, 780 F.3d 1084, 1100 (11th Cir. 2015). Therefore, counsel was not ineffective when he failed to object to proper comments. Further, Jarvis has not demonstrated counsel's failure to object to the comments resulted in prejudice. Before closing arguments, the trial judge instructed jurors that closing arguments do not constitute evidence.

---

[18] The quoted comments are from both the initial closing argument and the rebuttal argument.

Doc. 22-1 at 3. Counsel also explained to the jurors that closing arguments aid in their understanding of the case, but the arguments do not constitute evidence. Id. at 18. Accordingly, counsel's failure to object to the comments did not prejudice the defense, and Jarvis is not entitled to federal habeas relief.

### d. "Golden Rule" Argument

In subclaim three, Jarvis contends counsel was ineffective when he did not object to the prosecutor's "improper 'golden rule' argument." Petition at 41. According to Jarvis, the prosecutor asked the jurors to place themselves in Jarvis's position and determine if they could explain the items in their houses or their past purchases from stores. Id.

The Court finds counsel was not ineffective when he failed to object to the above comment. Improper golden rule arguments ask jurors to place themselves in the victim's position during the crime and imagine the victim's pain or fear. See Grossman v. McDonough, 466 F.3d 1325, 1348 (11th Cir. 2006); Mosley v. State, 46 So. 3d 510, 520 (Fla. 2009). Here the prosecutor merely asked the jurors to place themselves in Jarvis's position to evaluate the credibility of his testimony as a witness. Therefore, the prosecutor did not make an improper golden rule argument, and counsel was not ineffective for

making a meritless objection. See Diaz, 402 F.3d at 1142; Bolender, 16 F.3d at 1573.

### e. Prosecutorial Testimony

In subclaims eight and sixteen, Jarvis asserts counsel was ineffective when he failed to object to "prosecutorial testimony" during closing arguments. Petition at 43, 46. Jarvis refers to the following comments:

> We have the CDs in Nancy Holmes' house, his CDs which he has hidden. And what does hiding something tell you? Consciousness of guilt. And you know why he hid those? He hid those because he's a man interested in bombs and how to make bombs. He is interested in people who are interested in bombs. He is interested in the Unibomber, a man who made himself famous by killing people from a distance with pipe bombs. And he is interested in those subjects enough to type it in, go up on the Internet, pull it down into his computer, downloaded it, store that information in his computer, transfer it to a CD and then through that computer wherever, I don't know where that computer went, it's gone, we don't have it, it's destroyed.
>     . . . .
> We know he got rid of a tour[19] computer beyond any reasonable doubt, how do we know that? Detective Bialkoski who we've heard evidence and discussion from both sides how meticulous they were when they went to the scene saw the tour computer, was very explicit on it, talked about the imprint and the carpet as possibly being where it was and that imprint wasn't

---

[19] Throughout the transcript, "tower computer" is improperly referred to as "tour computer."

made by some case you take off and sit on something that has no weight to it. Byron Thompson examined his computer, he examined his girlfriend's computer, examined a laptop computer, Byron Thompson saw nothing on any of those computers about the bomb profile, about things that go boom, about the Un[a]bomber, what does that tell you? It had to be on a computer somewhere. Byron Thompson finds this stuff you've got all kind of stuff he found, he couldn't find it on a computer you can only find it on a disc. He put it on a disc and he got rid of the computer. . . .

Docs. 22-1 at 11; 26 at 23-24 (emphasis added).[20] Jarvis contends these comments invaded the jury's province by declaring "a 'fact' as proven." Petition at 46.

The record supports the postconviction court's conclusion that counsel was not ineffective when he failed to object to the above comments. In context, the comments are based on fair inferences from facts in evidence. JSO Detective Mark Bialkoski testified before law enforcement officers obtained a search warrant for Jarvis's house, Jarvis allowed them inside his house for a short period of time on January 6, 2001. Detective Bialkoski noticed a tower computer on the floor underneath the desk in Jarvis's bedroom at that time. Doc. 13-3 at 187-88. Detective Bialkoski participated in the execution of a federal search warrant on January 14, 2001, and he noticed the tower

---

[20] The quoted comments are from both the initial closing argument and the rebuttal argument.

computer was missing. <u>Id.</u> at 190-91. Additionally, FBI agent Byron Thompson analyzed two CD-ROMs found at the house of Jarvis's then-girlfriend. They included information on how to construct a bomb. Doc. 13-4 at 141-49. Jarvis admitted the CD-ROMs belonged to him. Doc. 14-6 at 17, 19. Based on such evidence, the comments properly concerned inferences that the jurors could draw from the evidence. <u>See</u> <u>Adams</u>, 339 F. App'x at 886. As such, counsel was not ineffective for failing to make a meritless objection. Accordingly, Jarvis is not entitled to federal habeas relief.

### f. Comments that Bolster the Credibility of State Witnesses

### (1) Subclaim 11

In subclaims four and eleven, Jarvis contends counsel was ineffective when he did not object to the prosecutors' comments improperly bolstering the testimony of State witnesses. Petition at 41, 44. Jarvis argues the prosecutor improperly endorsed Spohn as a witness when he referred to her testimony as reliable during closing argument. <u>Id.</u> at 41. Jarvis also objects to the following comments:

> And that black powder is the exact type of powder that Dan Renner and Robert Fanucci conversed about when he brought himself into that conversation. <u>And according to the defendant those two men have good memories</u> . . . .

62

He was truthful when he told you that <u>Robert Fanucci and Dan Renner were truthful and accurate. Honest men.</u> They were honest and accurate when they described the discussion about the powder, and Mr. Fanucci was honest when he told you that he saw that man on the computer at work researching bombs and explosives. . . .

     . . . .

You heard all that money, all those various obligations that he had. Jim Pearthree was quite clear that he made it clear to his client that he was under the possible threat of going to jail, he said in cross examination by Mr. Taylor on that videotape, I did not hedge, that would not be right of me to do that, I told him he could go to jail and that's what he told Miss Garceau, he wants to take that and minimize it but that's what he told her and <u>he told you Miss Garceau was honest.</u>

Docs. 22-1 at 9; 26 at 15, 20 (emphasis added).[21] Jarvis asserts the prosecutors' descriptions of the testimonies of Fanucci, Renner, and Garceau, as honest and accurate, constituted improper bolstering of State witnesses. Petition at 44. Jarvis also contends the prosecutors "misquoted" him because he never described any of the witnesses as honest. Id.

"A prosecutor commits improper vouching by arguing credibility based . . . on evidence not before the jury, or by placing the prestige of the government behind the witness, by making explicit personal assurances of the

---

[21] The quoted comments are from both the initial closing argument and the rebuttal argument.

witness' veracity." <u>United States v. Gonzalez</u>, 834 F.3d 1206, 1226 (11th Cir. 2016) (quotations and citations omitted). Here, the prosecutors did not imply that they had information outside the record that confirmed the veracity of the witnesses, and they did not improperly vouch for the credibility of State witnesses.

Moreover, the comments were reasonable inferences from the facts in evidence as to the credibility of the witnesses. <u>See</u> <u>Adams</u>, 339 F. App'x at 886. Jarvis did not dispute the testimonies of his coworkers, Fanucci and Renner. Indeed, he testified their recollections of the conversation were accurate. Docs. 14-8 at 6; 18-1 at 19. While  Jarvis did not refer to Garceau as honest during his testimony, he admitted that he would not characterize Garceau as "untruthful." Doc. 18-1 at 21. Therefore, the prosecutors' comments were not improper. Accordingly, counsel was not ineffective for failing to make a meritless objection.

### g. Comment on the Presumption of Innocence

Finally, as subclaim eighteen, Jarvis argues counsel was ineffective when he did not object to the prosecutor's comment on Jarvis's right to a fair trial and to the presumption of innocence. Petition at 47. In this regard, Jarvis objects to the following comment:

> William Jarvis has gotten all of the rights that he's entitled to. He's been ably represented, he's had the chance to confront the witnesses against him, and he had the right when this started to be presumed by you to be innocent. That cloak of innocence, ladies and gentlemen, has been shattered, that cloak of innocence is now stained with the blood of Lillian Jarvis, with the blood of Dan Showalter, with the blood of Marjorie Harris. He is no longer innocent, ladies and gentlemen.

Doc. 26 at 12-13.

The Court finds the prosecutor did not improperly comment on Jarvis's right to a fair trial or to the presumption of innocence. The prosecutor explained to the jurors that Jarvis had a right to the presumption of innocence. He then properly argued the State met its burden of proof and demonstrated Jarvis was guilty beyond a reasonable doubt based on the evidence presented at trial. Therefore, counsel was not ineffective for failing to make a meritless objection. See Diaz, 402 F.3d at 1142; Bolender, 16 F.3d at 1573. Accordingly, Jarvis is not entitled to federal habeas relief as to ground three.

### D. Ground Four

Jarvis alleges counsel was ineffective when he did not submit sufficient motions for judgment of acquittal. Petition at 18. Specifically, Jarvis contends counsel only made conclusory arguments that the State did not demonstrate Jarvis murdered the victim. Id. at 48. According to Jarvis, Florida law provides

that in a circumstantial evidence case, the State must exclude every reasonable hypothesis of innocence to demonstrate a defendant's guilt. Id. Jarvis argues the State's evidence did not exclude his reasonable hypotheses that the bomb was related to a bomb threat against Community Hospice Northeast, the victim's mother's place of employment, or that Alan Culla, the victim's ex-boyfriend, planted the bomb. Id. at 49-55. Jarvis asserts that if counsel had submitted sufficient motions for judgment of acquittal raising these arguments, the trial court would have granted the motions. Id. at 18-19.

Jarvis raised a substantially similar claim in state court as ground two of his Rule 3.850 Motions. Docs. 35-2 at 5; 35-3 at 6. In denying relief, the circuit court explained:

> Defendant alleges that counsel's motions for judgment of acquittal were legally inadequate and, thus, constituted ineffective assistance of counsel. Specifically, Defendant argues that counsel's motions for judgment of acquittal were too general and that counsel should have specifically argued that the State had failed to present any evidence that it was Defendant who placed the destructive device on the victim's doorstep. Initially, this Court notes that the record refutes Defendant's allegation that counsel failed to argue that there was a lack of evidence to prove that Defendant was the person who placed the bomb at the victims' house. At the conclusion of the State's case, counsel made a motion for judgment of acquittal, during which he argued that the State had failed to link Defendant to the crimes. At the close of

Defendant's case, counsel renewed that motion, again stating that Defendant had not been linked to the crime. Therefore, Defendant has failed to establish that counsel's performance was deficient. <u>Strickland</u>, 466 U.S. at 687.

Even if Defendant was correct and counsel should have argued this issue with more specificity, Defendant is unable to establish prejudice. This Court finds that there was a large amount of circumstantial evidence presented during the trial.

Doc. 39-1 at 8-9 (record citations omitted). The circuit court proceeded to detail the substantial amount of evidence implicating Jarvis, <u>id.</u> at 9-15, concluding:

Based on all of the above evidence presented in the State's case, even if counsel's motions for judgment of acquittal were deficient, a more specific motion that argued that the State had failed to establish that Defendant was the person who left the bomb, would have been denied. A motion for judgment of acquittal should only be granted if the evidence, as viewed in the light most favorable to the State, does not establish a prima facie case of guilt. <u>State v. Williams</u>, 742 So. 2d 509, 511 (Fla. 1st DCA 1999) ([citing] <u>Dupree v. State</u>, 705 So. 2d 90, 93 (Fla. 4th DCA 1998) ([en banc]); <u>Proko v. State</u>, 566 So. 2d 918 (Fla. 5th DCA 1990)); <u>see</u> <u>Criner v. State</u>, 943 So. 2d 224, 225 (Fla. 1st DCA 2006). Even in a case relying solely on circumstantial evidence, "the State would not be required to rebut every possible variation of events, but must only present evidence inconsistent with the Defendant's reasonable hypothesis of innocence." <u>McDuffie v. State</u>, 970 So. 2d 312, 331 (Fla. 2007) ([citing] <u>Delgado v. State</u>, 948 So. 2d 681, 690 (Fla. 2006)). As demonstrated above, the State presented extensive circumstantial evidence linking Defendant to the

crimes charged. Therefore, Defendant has failed to establish prejudice and his second ground is accordingly denied. <u>Strickland</u>, 466 U.S. at 687.

<u>Id.</u> at 15. The First DCA per curiam affirmed the denial of relief without a written opinion. Doc. 41-5 at 2.

To the extent that the First DCA denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Jarvis is not entitled to relief on the basis of the ineffectiveness claim.

Even assuming the appellate court's adjudication of the claim is not entitled to deference, Jarvis's ineffectiveness claim is without merit because the record supports the postconviction court's conclusion. A motion for judgment of acquittal "must fully set forth the grounds on which it is based." Fla. R. Crim. P. 3.380(b). However, Jarvis's description of Florida law goes too far. Even in a circumstantial evidence case, "the state is not required to 'rebut

68

conclusively every possible variation' of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events." <u>State v. Law</u>, 559 So. 2d 187, 189 (Fla. 1989) (footnote and citation omitted).

Jarvis has not demonstrated that counsel submitted insufficient motions for judgment of acquittal that prejudiced the defense. Even if counsel had presented Jarvis's proposed arguments, the trial court still would not have granted the defense's motions for judgment of acquittal. The State presented evidence inconsistent with Jarvis's theory that the bomb threat to Community Hospice Northeast was related to the bomb delivered to the victim's house. In his Petition, Jarvis relates Daniel Showalter's ex-wife, Connie Showalter, to the Hospice bomb threat because the individual who called in the threat had a southern accent. Petition at 51. According to Jarvis, Connie Showalter had a southern accent, and she was engaged in contentious divorce proceedings with Daniel Showalter, who was inside the house when the bomb exploded. <u>Id.</u> at 52. However, Daniel Showalter testified that Connie Showalter initially left him because she met someone else. Doc. 12-8 at 28, 45-46. Such testimony undermined Jarvis's theory with regard to Connie Showalter's motive and created a question of fact for the jury

69

Moreover, the State presented significant evidence contradicting Jarvis's general theory that someone else delivered the bomb. Multiple witnesses testified Jarvis displayed animosity toward the victim about their divorce. Docs. 12-7 at 158; 13-2 at 71-72, 75, 79-80, 85-89, 147; 13-3 at 22-24, 26-28. Specifically, Spohn testified Jarvis had discussed constructing bombs and specifically leaving a bomb disguised as a present for the victim. Doc. 13-2 at 81-83, 85-89. She testified Jarvis described placing the bomb inside a tackle box, using an Estes model rocket motor and gasoline, and wrapping the tackle box in paper. Id. at 82-83. Importantly, the surviving victims, Daniel Showalter and Marjorie Harris, described the bomb as a green tackle box wrapped in Christmas paper. Docs. 12-7 at 143-44; 12-8 at 33-35. In the bomb debris, law enforcement officers found pieces from a green tackle box, a wire from an Estes model rocket motor, and Christmas wrapping paper. Docs. 12-8 at 176-77; 12-9 at 50, 53-54; 12-10 at 103, 106, 109-11, 140-50. Multiple witnesses noted the smell of gasoline at the scene or from evidence collected at the scene. Docs. 12-8 at 40, 155; 13-1 at 48-49. And, a forensic chemist from ATF performed tests that detected the presence of gasoline on Daniel Showalter's jacket. Docs. 12-8 at 153-54; 13-1 at 47-50.

Officers also recovered two receipts inside Jarvis's house for successive transactions at Walmart on December 19, 2000. Doc. 12-9 at 114. The second receipt reflects Jarvis bought an Estes flight pack, mounting squares, tape, condoms, and Christmas wrapping paper. Docs. 13-1 at 195-96; 13-2 at 7-8. Although Jarvis had sufficient funds in his checking account to pay for the items on both receipts, Jarvis paid for the items on the first receipt by check and the second receipt in cash. Docs. 12-9 at 163-64; 13-1 at 193, 195-96; 13-2 at 45, 47-48. The State matched the wrapping paper found in the bomb debris with the UPC code for a wrapping paper shown on the receipt. Docs. 13-1 at 186; 13-4 at 59, 62, 84-85. Daniel Showalter also identified that wrapping paper as the wrapping paper used on the bomb. Doc. 12-8 at 33-34. Further, officers found CD-ROMs with information on constructing bombs hidden in Jarvis's girlfriend's house, Docs. 12-9 at 124-25; 13-3 at 141-57, and Jarvis admitted to hiding the CD-ROMs. Doc. 14-6 at 17, 19.

Given all of the evidence, Jarvis has failed to demonstrate prejudice, and relief on ground four is due to be denied. See Strickland, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").

### E. Ground Five

Jarvis next contends counsel was ineffective when he failed to investigate and present evidence of Jarvis's alibi. Petition at 19. Specifically, Jarvis alleges counsel should have timely enforced a subpoena for records of his activity on AOL. Id. at 55. By the time counsel sought assistance to enforce the subpoena, AOL had deleted the records in the normal course of business. Id. Jarvis also argues counsel should have interviewed his supervisor, Sally Bell. Id. Jarvis alleges that he worked the evening of January 5, 2001, and the morning of January 6, 2001. Id. He contends Bell would have testified that Jarvis's work required him to be alert; therefore, "it would be reasonable and prudent to spend most of the time between such shifts in bed, sleeping." Id. Jarvis further argues counsel should have presented his telephone records from the morning of January 6, 2001, as well as investigated and presented evidence of construction that delayed travel between Jarvis's house and the victims' house. Id. at 55-57. Additionally, Jarvis argues counsel should have challenged the newspaper carrier, Cathy Hickson, more vigorously about the time at which she delivered newspapers to the victims' neighborhood on the morning of the bombing. Id. at 57-58. According to Jarvis, Hickson provided different delivery times during her interview with law enforcement and during

her deposition. Id. Counsel should have asked Detective Bialkoski "to confirm the original police report," and he should have called Hickson's route manager to determine the time carriers generally received the newspapers for distribution. Id. at 58.

In its order denying relief on ground one of Jarvis's Rule 3.850 Motions, the state court set forth the evidence relevant to this claim as follows:

> The evidence presented at trial established that the bomb detonated between 6:30 A.M. and 7:00 A.M. on January 6, 2001. Defendant testified that he worked until 9:30 p.m[.] on January 5, 2001 and then went home and spent a couple of hours online on his computer. He further testified that he made a phone call to Nancy Holmes, his girlfriend at the time, at approximately midnight and then went to bed between 1:30 A.M. and 2:00 A.M. on January 6, 2001. He also testified that he woke up at approximately 5:00 A.M. and, starting at approximately 5:15 A.M., was on his computer again for a few hours. Ms. Holmes testified and corroborated Defendant's testimony that he was on the phone with her from 11:45 P.M. until midnight on January 5, 2001, and then again from 12:10 A.M. until 12:20 A.M. on January 6, 2001. She also testified that the phone calls came from or were to Defendant's home. Defendant also admitted into evidence records from America On-Line ("AOL") which allegedly indicated that he was logged onto his computer until 1:30 A.M. on January 6, 2001 and did not log back on until 5:17 A.M. that same day. It is his testimony that he was alone sleeping during that time.
>
> According to Defendant's own evidence, his whereabouts are unaccounted for from 1:30 A.M. until

73

5:17 A.M. on January 6, 2001 (i.e., three hours and forty-seven minutes). Defense witness Derek Pratico testified that the mil[e]age between Defendant's residence and the victims' residence was fifty-four miles and that, driving the speed limit, it took him fifty-seven minutes to make the trip one-way. Defendant testified that, due to construction in 2001, it normally took him approximately between an hour and ten minutes and an hour and fifteen minutes to make the one-way trip. Even taking this evidence in the light most favorable [to] Defendant, he had ample time between 1:30 A.M. and 5:17 A.M. on January 6, 2001 to drive from his house to the victims' house, leave the bomb on the doorstep, and then return home.

Defendant did present the testimony of Cathy Hickson, who testified that, in the early morning hours of January 6, 2001, she had delivered newspapers to the victims' adjacent neighbors. She indicated that she delivered those papers at approximately 3:30 a.m[.] that morning and did not recall seeing a package at that time. On cross-examination, she testified that she was not exactly sure of the time and that it could have been as late as 4:23 A.M. She also stated she delivered about four hundred newspapers that morning, it was dark, and she could not recall if there was a light on in the victims' home. As such, her testimony does not conclusively establish that there was or was not a package on the victims' porch when she drove by. Therefore, it does not negate the possibility that Defendant may have placed the package sometime between 1:30 A.M. and 5:17 A.M. on January 6, 2001.

Defendant's own evidence established that he had no alibi between 1:30 A.M. and 5:17 A.M. on January 6, 2001. It also established that this was ample time to drive from his house to the victims'

74

> home, leave the bomb on the porch, and return to his
> own house. . . .

Doc. 39-1 at 6-8 (record citations omitted).

The claim Jarvis raises in ground five is substantially similar to the

claim he raised in ground twelve of his Rule 3.850 Motions. Docs. 35-2 at 21-

24; 35-3 at 22-25. In denying relief, the circuit court explained:

> In Ground Twelve, Defendant alleges that
> counsel was ineffective by failing to properly
> investigate and present evidence in support of
> Defendant's alibi claim. First, Defendant alleges
> counsel should have procured and presented the jury
> with AOL records, work records, and phone records in
> order to corroborate Defendant's testimony regarding
> his whereabouts on January 5th and 6th, 2001.
> However, Defendant is unable to establish that the
> lack of these records prejudiced him because, as
> detailed earlier in Ground One above, such records
> would have been cumulative to the evidence
> presented. Also, the records would not have negated
> the fact that there was a three hour and forty-seven
> minute time frame during which Defendant could not
> account for his whereabouts.
>
> Second, Defendant alleges counsel should have
> called his work supervisor to testify that it would have
> been "reasonable and prudent" for him to have been
> sleeping prior to going to work on January 6, 2001.
> However, such testimony would not have established
> that Defendant actually slept instead of delivering the
> bomb to the victims' residence. What's more, there is
> no reasonable probability that any evidence regarding
> construction and delays on the roadways would have
> changed the outcome because, as Defendant had

earlier testified, at the time, the one-way trip from Defendant's house to the victims' home took approximately one hour and fifteen minutes. Thus, as noted in Ground One above, even under Defendant's version of how long it took to take the trip, he still had ample time to deliver the bomb.

Third, Defendant argues that counsel should have challenged witness Cathy Hickson regarding the discrepancy in her testimony as to what time she delivered the newspapers to the victims' neighbors. However, as noted in Ground One, Ms. Hickson's testimony did not conclusively establish that there was, or was not, a package outside the victims' house at either 3:30 A.M. or 4:23 A.M.

Therefore, even with the additional evidence Defendant argues should have been presented to the jury, there is no reasonable probability that the outcome of his trial would have been different. <u>Strickland</u>, 466 U.S. at 687. Accordingly, Defendant's twelfth ground is denied.

<u>Id.</u> at 53-54 (record citations omitted). The First DCA per curiam affirmed the denial of relief without a written opinion. Doc. 41-5 at 2.

To the extent that the First DCA denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not

76

based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Jarvis is not entitled to relief on the basis of the ineffectiveness claim.

Even assuming the appellate court's adjudication of the claim is not entitled to deference, Jarvis's ineffectiveness claim is without merit because the record fully supports the postconviction court's conclusion. Jarvis has not demonstrated counsel's failure to investigate or present the proposed alibi evidence prejudiced the defense. Jarvis testified he went to sleep at 1:30 a.m. or 2:00 a.m. on January 6, 2001, and he did not wake up until approximately 5:00 a.m. that same morning. Doc. 14-5 at 3-4. According to his own testimony, Jarvis cannot account for three hours on January 6, 2001. The purported evidence, specifically the AOL records, telephone records, or testimony from Jarvis's supervisor, would not provide an alibi for the three hours during which the State proposed Jarvis delivered the bomb.

Further, Jarvis contends counsel should have called a witness to verify the construction on the route between his house and the victims' house so that the defense could demonstrate it would have taken Jarvis one hour and fifteen minutes to drive to the victims' house. Even if counsel had called such a witness, such testimony would not foreclose the possibility that Jarvis had

sufficient time to deliver the bomb during a three-hour period. Doc. 14-5 at 3-4.

Jarvis also argues that counsel should have challenged Cathy Hickson's testimony about the time at which she delivered newspapers, interviewed the route manager, or asked Detective Bialkoski to verify the police report. However, such evidence still allowed for the possibility that Jarvis delivered the bomb. Hickson testified she did not deliver a newspaper to the victims' house. Doc. 14-1 at 16. She instead delivered newspapers to the houses on either side of the victims' house and delivered the newspapers by throwing them from her vehicle. Id. She noted it was dark outside that morning, and she did not recall seeing any packages. Id. at 17. Moreover, the State cross-examined Hickson as to the delivery time. She admitted that the delivery time could have been 4:00 a.m. on January 6, 2001, but it was unlikely that she delivered newspapers at that time because she made the delivery early that day. Id. at 19. She ultimately admitted that she could have told Detective Bialkoski that she delivered the newspapers at 4:23 a.m., but she could not recall making such a statement. Id. Even if counsel had taken the proposed actions, Jarvis could not account for approximately three hours on January 6,

2001, and he cannot demonstrate prejudice. For the foregoing reasons, federal habeas relief on ground five is due to be denied.

## F. Ground Six

Jarvis alleges a change in the law as set forth in <u>Holmes v. South Carolina</u> was sufficient to remand his case. Petition at 19. With regard to this contention, Jarvis asserts the trial court's refusal to admit evidence tending to prove another person may have murdered the victim violated <u>Holmes</u>, which the Supreme Court decided before Jarvis's convictions and sentences became final. <u>Id.</u> According to Jarvis, when he brought a change of law claim in his Rule 3.850 Motions, the postconviction court determined <u>Holmes</u> did not apply retroactively to his case. <u>Id.</u> at 59.

Jarvis raised a substantially similar claim in state court as ground twenty-seven of his Rule 3.850 Motions. Docs. 35-2 at 42-43; 35-3 at 43-44. In denying relief, the circuit court explained:

> Defendant argues that he is entitled to postconviction relief based on a change in the law. During the trial, Defendant proposed the theory that the bombing was done by Alan Culla and not Defendant. As noted in Ground Twenty-Three, counsel elicited testimony regarding Mr. Culla's relationship with Ms. Jarvis and his dislike of her. Counsel also tried to present the testimony of Kimberly Jenkins, a former girlfriend of Mr. Culla, to show that Mr. Culla had committed acts of violence and stalking against her. The trial court

79

excluded the witness, citing a lack of similarity between the acts committed against Ms. Jenkins and the bombing in the instant case. The trial court allowed counsel to present Ms. Jenkins' testimony in the form of a proffer. Following the proffer, the trial court reiterated that it was excluding the testimony because there was no evidence of any violence by Mr. Culla against Ms. Jarvis, and the acts of violence against Ms. Jenkins were too dissimilar from the bombing. Defendant argues that, since the trial court's decision on this issue, there has been a change in the law which would have allowed Ms. Jenkins' testimony.

. . . .

Defendant also cites to <u>Holmes v. South Carolina</u>, 547 U.S. 319 (2006), alleging that it constitutes a change in the law on this issue. In order to be cognizable in a Rule 3.850 proceeding, an alleged change in the law must (a) emanate from the Florida Supreme Court or the United States Supreme Court, (b) be constitutional in nature, and (c) constitute a development of fundamental significance. <u>Witt v. State</u>, 387 So. 2d 922, 931 (Fla. 1980). Most changes of law which are of fundamental significance fall within two categories: those "which place beyond the authority of the state the power to regulate certain conduct or impose certain penalties," and "those which are of sufficient magnitude to necessitate retroactive application." <u>Id.</u> at 929. In contrast, are those changes which are considered "evolutionary refinements in the criminal law, affording new or different standards for the admissibility of evidence, for procedural fairness, for proportionality review of capital cases, and for other like matters. Emergent rights in these categories, or the retraction of former rights in this genre, do not compel an abridgement of the finality of judgments." <u>Id.</u>

80

In Holmes, the Supreme Court relied on 1987 and 1988 case law which holds that a criminal defendant's Sixth Amendment right to a meaningful opportunity to present a complete defense is abridged by rules of evidence which infringe upon weighty interests of the accused, are arbitrary, or are disproportionate to their designed purposes. Holmes, 547 U.S. at 324-25 ([quoting] United States v. Scheffer, 523 U.S. 303, 308 (1998); Rock v. Arkansas, 483 U.S. 44, 58 (1987)). Based on this law, the Supreme Court vacated a judgment of the South Carolina Supreme Court which applied the rule that "'where there is strong evidence of [a defendant's] guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt' may (or perhaps) must be excluded." Id. at 329-31. The Court held that this rule improperly focused on the strength of the prosecution's case rather than the probative value or potential adverse effects of admitting evidence of a third party's guilt. Id. at 329.

The Holmes case does not constitute a change in the law of fundamental significance which would warrant relief in a postconviction motion. Witt, 387 So. 2d at 931. At most, this was an evolutionary refinement of criminal law regarding the standards for the admissibility of evidence. Id. at 929. Further, this Court notes that the trial court did not follow the rule of law struck by the Supreme Court in Holmes. The decision to exclude Ms. Jenkins' testimony was not based on the strength of the State's case, but, rather, on the lack of similarity between the alleged violent acts committed by Mr. Culla and the bombing in the instant case. Accordingly, Defendant's twenty-seventh ground is denied.

Doc. 39-1 at 91-94 (record citations omitted). The First DCA per curiam affirmed the denial of relief without a written opinion. Doc. 41-5 at 2.

To the extent that the First DCA denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Jarvis is not entitled to relief on the basis of this claim.

Even assuming the appellate court's adjudication of the claim is not entitled to deference, Jarvis's claim is without merit because the record supports the postconviction court's conclusion. Although <u>Holmes</u> applied to Jarvis's case,[22] the trial judge's decision comported with the tenets set forth in <u>Holmes</u> as noted by the postconviction court.

---

[22] The Supreme Court decided <u>Holmes</u> on May 1, 2006. 547 U.S. at 319. On October 10, 2003, the jury found Jarvis guilty of all counts. Doc. 11-3 at 23-27. The First DCA affirmed Jarvis's convictions and sentences on December 22, 2005, Doc. 32-2 at 2, and issued the mandate on March 16, 2006, Doc. 32-5 at 2. The United States Supreme Court denied Jarvis's petition for writ of certiorari on October 2,

In <u>Holmes</u>, the United States Supreme Court determined the South Carolina Supreme Court violated a defendant's right to present a complete defense by determining "'where there is strong evidence of a[] [defendant's] guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the [defendant's] own innocence.'" 547 U.S. at 324 (quotations and citation omitted). Well-established evidence rules excluding evidence of third-party guilt conform to the Constitution when the rules permit trial judges to exclude defense evidence by evaluating "if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." <u>Id.</u> at 326. The Court found that the South Carolina Supreme Court "radically changed and extended" such a rule by focusing on the strength of the prosecution's case as opposed to the third-party evidence's probative value or the potential adverse effects of admitting such evidence. <u>Id.</u> at 329.

Here, Jarvis attempted to present evidence that Alan Culla delivered the bomb that killed the victim. To support this version of events, Jarvis proffered the testimony of Kimberly Jenkins, Culla's ex-girlfriend. Jenkins testified she

---

2006. <u>Jarvis</u>, 549 U.S. at 849. Therefore, <u>Holmes</u> applied to Jarvis's case. <u>See</u> <u>Griffith</u>, 479 U.S. at 327.

began dating Culla in July of 2000. Doc. 13-5 at 57. She noted they began arguing some months later. Id. at 59. She described Culla as emotionally, not physically, abusive until January 2001, when he "put his hands around [her] throat." Id. at 61-62. Jenkins described an incident where he broke down her door after an argument. Culla also blocked her car from exiting a parking lot, ultimately prompting her to seek an injunction against him. Id. at 64-65. Jenkins testified Culla had been a Navy corpsman and kept hypodermic needles and a bottle of potassium chloride inside a duffle bag. Id. at 65-66. On cross-examination, Jenkins testified Culla never expressed an interest in bombs, and she never experienced any incidents during which Culla used explosives. Id. at 67-68. She never saw any bomb materials around her house or his apartment. Id. at 68.

The trial judge's reasoning for excluding Jarvis's proffered evidence conformed with the principle set forth in Holmes. The trial judge ultimately excluded the evidence after evaluating it as "reverse Williams[23] Rule" evidence.[24] However, in doing so, the judge did not exclude the evidence based

---

[23] Williams v. State, 110 So. 2d 654 (Fla. 1959).

[24] Pursuant to Florida law, a defendant may present proof of third-party guilt, or "reverse Williams Rule" evidence. See Rivera v. State, 561 So. 2d 536, 539 (Fla. 1990). Evidence of a third-party's past criminal conduct must bear "a close similarity of facts, a unique or 'fingerprint' type of information, for the evidence to be relevant." State v. Savino, 567 So. 2d 892, 894 (Fla. 1990). Moreover, its admission is

on the strength of the State's case, and he made no statement evaluating the strength of the State's evidence relative to the proffered testimony. <u>Id.</u> at 37-76. Rather, the judge determined insufficient similarities existed between the prior bad acts of Culla and the violence perpetrated against the victim. <u>Id.</u> at 71. The judge reasoned, "the logic and relevance [were] too attenuated potential for abuse or leading the jury down a rabbit trail without sufficient nexus in fact." <u>Id.</u> at 73. Such an analysis comports with <u>Holmes</u>. Therefore, even applying <u>Holmes</u> to Jarvis's case, the trial court still properly excluded Jenkins's testimony. Accordingly, Jarvis is not entitled to habeas relief on ground six.[25]

## VII. Certificate of Appealability
## Pursuant to 28 U.S.C. § 2253(c)(1)

If Jarvis seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make

---

circumscribed by the trial judge's evaluation of the evidence's "[r]elevance and weighing the probative value of the evidence against the possible prejudicial effect . . . ." <u>Id.</u>

[25] To the extent Jarvis contends the postconviction court erred when it denied ground twenty-seven of his Rule 3.850 Motions, his claim is not cognizable in a petition for writ of habeas corpus. <u>See</u> <u>Quince</u>, 360 F.3d at 1262.

this substantial showing, Jarvis "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. <u>See</u> <u>Slack</u>, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Id.</u> Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.      The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.      The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.      If Jarvis appeals the denial of the Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4.      The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 20th day of July, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

87

Jax-9
C:      Counsel of record